## EMERY INDUSTRIES, Inc., v. SCHUMANN et al.

### No. 7095.

Circuit Court of Appeals, Seventh Circuit.
March 22, 1940.

Rehearing Denied May 3, 1940.

Henry M. Huxley and Ralph Munden, both of Chicago, Ill., for appellants.

Edmund P. Wood and Edward B. Evans, both of Cincinnati, Ohio, and Russell Wiles, George A. Chritton and Chritton, Wiles, Davies, Hirschl & Dawson, all of Chicago, Ill., for appellee.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

The District Court held three claims of two patents in the dry cleaning art, valid and infringed. Claims 1 and 6 of Reddish Patent No. 1,911,289, covering a "Method of Cleaning Fabrics," issued May 30, 1933, on an application filed February 4, 1932,

and claim 2 of Reddish Patent No. 2,024,-981, covering an "Absorbefacient for Dry-Cleaning," issued December 17, 1935, on a continuation of the application filed October 31, 1930, were the claims involved.

Invalidity and noninfringement were the defenses. Appellants rely on both in this court.

EVANS, Circuit Judge.

We have before us, two patents, both in the dry cleaning art. They are based on copending applications in the Patent Office. Both grew out of and followed an earlier application, Serial No. 492,611, which was voluntarily dismissed about the time the two applications, upon which the two patents in suit depend, were filed. Two claims (1 and 6)[1] of the earlier patent covering what the patentee calls "Method of Cleaning Fabrics" are involved. The other patent, with one claim (2)[2] in issue, is described in the title as an "Absorbefacient for Dry-Cleaning."

Dry cleaning is now widely and extensively used. A little is known about it by most everyone. Only a few have a knowledge of the chemistry back of the common practices of this art. Cloth and fabrics of all kinds, in ordinary use or wear, become soiled and dirty. They must be cleaned. The soil which is to be removed, has, by the workers in this field, been divided into two classes: (a) naphtha soluble spots such as fat stains, oily or grease spots, etc., (b) water soluble spots such as syrup, perspiration, etc.

The basis of this classification is to be found in the fact that the treatment which removes soil spots (a) is ineffectual when directed against soil spots of the class (b).

Prior to Reddish's activities it was common and old practice to use naphtha, which would remove grease, but not water, soluble spots. The water soluble spots (soil of class (b)) were usually removed by hand, although there was another process (unimportant here) sometimes practiced. This removal by hand took time and was expensive. As a result, those working in this field sought a method for cleaning both kinds of spots or soil in one process.

Reddish says his process, covered by the patents in suit, met this requirement. They solved the problem through a simultaneity of operation of the two processes. More,—originality, ingenuity, and novelty were united in the disclosed practices which spelled patentable discovery of a high order.

Defendants, it is not hard to infer, place a vastly different appraisal on the Reddish process. Novelty and originality are denied. Ingenuity was admitted, but the ingenuity was not in the Reddish discovery.

It is unnecessary to determine the extent of the success which attended the efforts of Reddish and others to whom reference will be made, for utility is established, if only partial success be attained.

It is sufficient to say that both patents, covering this dry cleaning art, were directed to the discovery of a successful method

[1] "1. In the dry cleaning art, the process which comprises cleaning fabrics with a dry cleaning solvent of the type exemplified by a volatile hydrocarbon or chlorinated hydrocarbon which is moisture absorbent by reason of an absorbefacient dissolved therein and which contains an amount of moisture determined in relation to the weight and nature of the batch of fabrics being cleaned but does not exceed the moisture tolerance of the fabrics."

"6. The process of cleaning successive batches of fabrics in a body of dry cleaning solvent of a type exemplified by a volatile hydrocarbon or chlorinated hydrocarbon, said process comprising rendering the cleaning solvent moisture absorbent by dissolving an absorbefacient therein and cleaning the successive batches of fabrics in said body of solvent, the cleaning of each batch of fabrics being accompanied by the charging of the cleaning solvent with moisture, the amount of moisture in each instance, being within the limitation of the moisture tolerance of the particular batch, whereby the removal of the batch removes from the solvent substantially the moisture content previously added."

[2] "2. A method of removing oil soluble and water soluble soil concurrently from fabrics of a type normally injured by water, said method, comprising, treating the fabrics with a liquid comprising dry cleaning solvent and relatively small amounts of oil soluble mahogany sulphonic bodies of the group consisting of the acids and salts and water, the amount of water present being within the moisture tolerance of the fabrics, the amount of mahogany sulphonic bodies being adapted to disperse the water to such a degree that it is not injurious to the fabrics being treated and agitating the fabrics in said liquid until the fabrics have absorbed substantially all of the moisture from the solvent."

of removing both kinds of stains or soils by one operation. The later patent is the narrower one, and while broader than its title, is nevertheless limited by its adoption of mahogany sulphonic bodies as its absorbefacient.

Plaintiff asserts its patents are so outstanding as to justify counsel in saying a new art was created and the claims are entitled to a most liberal construction. In short, he approaches the issues on the theory that he is dealing with discoveries of great merit. In addition he contends that the presumption of validity which arose from the issuance of the patent has been greatly strengthened by the decisions of two district courts which have upheld these claims, the court below, and the District Court for the Eastern District of Wisconsin.

Defendants rely upon an Ohio District Court ruling which however was based upon a finding of non-infringement.

We are convinced that the problem which confronted Reddish and others was not a difficult one, and the growth of the dry cleaning art, while extensive, has merely followed the growth of population and the adoption of new wearing apparel during the last few decades which made use of fabrics with new sizing, and finishing materials, special weaves, peculiar thread twists, and new and brilliant dye stuffs. Increasing use of dry cleaning establishments led to economies and improvements in the practices of that art. Removing spots by two separate processes was expensive and slow. Therefore, the problem was to remove them by one process, if possible. Whether Reddish's contributions evidenced patentable novelty depends upon the state of the prior art and the practices known or disclosed at the time he made his applications for the patent. Our appraisal of his contributions must be made in the light of this art.

We turn first to the file wrapper, then to the patents cited in the prior art, to-wit, U. S. Patents to Weiss, issued in 1910; to Hatfield, issued in 1929; to Jackson, issued in 1930; and the British Patent to Petroff, issued in 1913.

The Patent Office history deals more extensively with the earlier Reddish application which was discontinued, but which nevertheless applies specifically to claims quite similar to the ones covered by the patent in question. That there is similarity in the instant patents and the discontinued application is shown by the following statement in the first Reddish patent:

"This application is a continuation in part of my previous co-pending application, Serial No. 492,611, which discloses the water dispersing action of mahogany sulfonates and several of the other absorbefacients and one use of this dispersing action in the cleaning of fabrics."

The second Reddish patent ties up with this application in the following words:

"This application is a continuance of my application, Serial No. 492,611, filed October 31, 1930, and is a continuation in part in relation to my copending application Serial No. 590,981."

Reddish dismissed this first application voluntarily.

Among the many claims in this dismissed application were the following two:

"6. A dry cleaning method, comprising, the step of immersing the article to be cleaned in a bath containing an organic dry cleaning solvent throughout which is dispersed a body comprising true mahogany sulfonic bodies and water.

"7. A dry cleaning soap, comprising, true mahogany sulfonic bodies, and water."

These claims were rejected on the disclosure of the Petroff British patent, and many new claims were again substituted, all of which were rejected. It was at this point that the Patent Office gave a statement of the existing prior art and the accuracy of this statement is attested to by plaintiff's acquiescence in disallowance of the claims.

The Examiner said:

"Applicant's remarks relative to the use of mahogany sulfonic bodies as a stabilizing agent is noted. It is pointed out, however, that dispersions of the type indicated are old as shown by Holmes, Mitchell, Popsiech and Pungs. Since mahogany sulphonic compounds are old and their properties as emulsifying agents are known, it would not involve invention to substitute such compounds for those shown in the references."

This expression of the state of the prior art is further set forth by the Examiner a month later, when he said, speaking of the first Reddish patent:

"The Examiner has considered applicant's remarks but is of the opinion that the claims do not set forth any patentable in-

vention over the prior art as disclosed in the references, for reasons indicated.

"Applicant has disclosed that it is possible to remove oil soluble and water soluble stains from fabrics by means of a dry cleaning fluid containing a quantity of moisture dispersed therethrough so that the composition is substantially optically clear. In order to admix the water readily with the dry cleaning solvent, applicant uses what he terms 'an absorbefacient,' a composition having emulsifying properties, several examples of which are disclosed. Another feature disclosed is that the quantity of water adapted to produce the best results should be calculated and controlled in relation to the weight of the fabrics treated and not relative to the quantity of dry cleaning solvent.

"In view of the fact that it is old to use dry cleaning solvents containing water dispersed therethrough as shown by Dobmaier, Popsiech, Petroff (both patents), Hatfield, of record and Moscowitz supra, and that such compositions will remove both oil soluble and water soluble stains, simultaneously, (See Weiss, page 1, lines 35 to 38 and Moscowitz, page 1, lines 67 to 82), the claims do not set forth any patentable invention over the prior art."

The second patent likewise met with rejection by the Patent Office, of claims quite similar to the one finally allowed. Therein claim 2 read as follows:

"2. A dry cleaning solution comprising, a dry cleaning solvent and mahogany sulphonic bodies absorbed therein in quantities sufficient to enable the solvent to absorb moisture."

The Examiner's ruling thereon is as follows:

"Claim 2 is likewise rejected on Petroff. Petroff discloses mahogany acids dissolved in various common dry cleaning solvents and water is present as the mahogany acids are added in aqueous solution."

This brings us to an analysis of the steps of the process set forth in the claim. They are:

*First.* Use dry cleaning solvent (present in all claims and old in the art).

*Second.* An absorbefacient dissolved in the solvent. Claim 2 of the second patent restricts the absorbefacient to mahogany sulphonic bodies. The use of absorbefacient in naphtha was old. The use of mahogany sulphonic bodies was disclosed by the Petroff British Patent as an effective absorbefacient.

*Third.* Add moisture, the amount of which should be determined (a) in relation to the weight and nature of the fabric being cleaned, (b) limited to the moisture tolerance of the fabric.

It was old to add water and old to determine the amount of water generally by the weight of the fabric for this was particularly pointed out in the Jackson patent, where he said: "The water required is proportional to the weight of materials cleaned."

We then have a process set forth consisting of three steps, of which steps one and two were old and in common practice. Not only did the examiner so hold and Reddish acquiesce therein, but the prior art leaves no room for uncertainty.

Our attention therefore must be directed to the part of the Reddish teaching which deals with the water content, which, while not a step in itself, is rather a specific limitation of water in the aqueous solution into which the mahogany sulphonic substance must be injected. In other words, it is old to use water as one of the two substances to be dispersed with naphtha through the agency of an absorbefacient. It is, however, at least theoretically sound to base novelty upon the percentage or proportion of water so used.

We need not elaborate on this, however, for not only are the specifications (and the brief and argument of plaintiff's counsel) filled with this water tolerance thought, but it is obvious that it affords the only possible basis for a valid patent grant. To substantiate this statement reference is made to the specifications where it is said:

"Still otherwise expressed, the invention resides in the concept and determination that an appropriate amount of moisture appropriately dispersed throughout a dry cleaning solvent, possesses the desirable cleaning properties of water but not the disadvantages.

"The next feature of this invention * * is that the quantity of moisture adapted to produce the best results should be calculated and controlled primarily in relation to the weight of the fabric treated, rather than in relation to the weight or quantity of the cleaning solvent used."

In the second patent Reddish stresses the relation of water to fabric in the following language:

"The ratio of moisture to fabric to be used in practicing this invention must depend upon the moisture tolerance of the type of fabric being cleaned."

In making the statement that in step 3 the water limitations constitute the only basis for sustaining the patent, we are not to be understood as limiting the discovery to this step, or to this limitation in this step in the process. The process must be, of course, viewed as a complete one. A step, long or short, should not be appraised alone. It is in connection with other steps, all perhaps old, that we must judge and appraise its novelty and ingenuity. So understood, it is obvious that a very simple step may, when but a single step in a complete process, open the door which has been heretofore tightly locked.

Therefore, we approach the process as one of three steps, two of which clearly are old and in extensive use, and had been described in British and United States patents.

It may be said with satisfying certainty that dry cleaning solvent, like naphtha or any of the many volatile hydrocarbons or chlorinated hydrocarbons which are moisture absorbent when aided by absorbefacient, was old and had been used successfully in removing certain kinds of spots in clothing long prior to 1930 or before Reddish appeared in the picture. It was commercially practiced by workers in dry-cleaning establishments and in homes where grease spots were to be removed from cloth. Equally clear is the fact that absorbefacients were commonly used to admix naphtha and water. Moreover, one of the absorbefacients thus used was soluble mahogany sulphonic bodies.

In fact, Reddish, in the abandoned application, recognizes that the products obtained by the Petroff-Humphrey process were mahogany sulphonates; were colloidally soluble in water; and were "soluble in all proportions in oil, either alone or mixed with oil." Also that they had "the capacity to absorb approximately their own weight of water and will retain their oil solubility."

Without any teaching from these patents, we are unable to understand how an absorbefacient of any kind could be used in a dry cleaning bath with naphtha or other cleaning solvent without water. As a dry cleaning mixture it is obvious that cleaning solvent and an absorbefacient necessitate a liquid—otherwise why the absorbefacient? The specifications, however, remove the doubt if one otherwise existed. The formulae set forth in the specifications are elaborations of the words of the claims, to-wit, "the amount of water present being within the moisture tolerance of fabrics," (claim 2, patent '981) and "which contains an amount of moisture determined in relation to the weight and nature of the batch of fabrics being cleaned." (claim 1, patent '289.) At another point he tells us the moisture content should be from 5 to 30% of the weight of the fabric.

The foregoing lengthy recitation is made to localize the novel factor in the process, which alone can save this patent in view of the prior art.

To what extent was the water limitation novel—inventive in its ingenuity? We are unable to acknowledge either novelty or inventiveness in the use of water of from 5-30% of the weight of the fabrics in the process under consideration. Nor does the added limitation that the water should not exceed the moisture tolerance of the fabric aid the patentee. As we construe the claims, and assuming that we may introduce the language and formulae of the specifications into the claims, the instruction is directed to the dry cleaner, namely, to one skilled in the art. He is told, "Use your experience as your guide. Your experience teaches you that some fabrics are sensitive to and easily damaged by water. Others are little affected by moisture. If your bath of fabrics to be cleaned consists of silks and satins, or evening dresses, the percentage of water must be lessened. If it be men's woolen suits which comprise the batch, the percentage of water may be trebled. In no case go beyond *the moisture tolerance of the fabrics.*"

The italicized words mean what has just before been stated. They mean, "Based on your experience, do not go beyond the capacity of the garment to absorb water, without damage or danger of shrinking or leaving water spots. We give you wide latitude in our specifications when we say from 5–30% of water may be used—within that range use your judgment."

█ Our conclusion is, that all claims are invalid for want of inventive novelty. It was not patentable in this art to describe a process consisting of three steps—all old —despite the fact that the last step contained a limitation that the amount of wa-

ter should not exceed the water tolerance of the fabric to be cleaned.

There is another fatal weakness to both of these patents. Plaintiff asks us to examine the specifications and there we will find a specificity which is lacking in the claims themselves.

In the specifications we find limitations of from five to thirty per cent of moisture. This limitation is not found in any of the claims. Neither the formula nor the proportions are set forth in the claims. In discussing the claims of the patent, here in issue, plaintiff always refers to them in the light of the specifications which are not specifically made a part of the claims. Under certain conditions we think this is legitimate, and in all cases the specifications should be read as the background of the claims. At times, courts should read into the claims the disclosure of the specifications. Construing a patent is a practical matter. It is often a matter of getting the applicant's meaning, his full disclosures and their limitations. Hence we connect the reading of the claims with the reading of the specifications. When necessary and fair to both sides—the public and the inventor, we are justified in adopting the more elaborate essential statements of the specifications as explanatory of and as a part of the claims.

The weakness of which we speak, however, in reference to the claims before us, is not that the specifications are not made a part of the claims, but rather, if they are read into and limit the claims, then infringement is avoided. For example, if we read into the claims in controversy the limitations of five to thirty per cent of moisture, then defendants do not infringe. We are clearly satisfied that defendants do not infringe the sixth claim of the first patent, and for the same reason, namely, that the formula designated a ratio of absorbefacient to naphtha, claim two of the second patent is not infringed by defendants' process.

It is impossible for us to allow these disputed claims to be supported and made more definite and certain by reference to the specifications for the purpose of upholding their validity, and at the same time eliminate the specification restrictions in order to include the defendants as infringers.

The decree is reversed, with directions to dismiss the complaint.