The DOW CHEMICAL COMPANY, A Delaware Corporation

v.

AMERICAN CYANAMID COMPANY.

Civ. A. No. 82–2355.

United States District Court,
E.D. Louisiana.

Aug. 15, 1985.

472

F. Frank Fontento, New Orleans, La., Bernd W. Sandt, Dow Chemical Co. Patent Dept., Midland, Mich., for plaintiff.

Larry B. Kelleher, New Orleans, La., D. Dennis Allegretti, Chicago, Ill., for defendant.

## OPINION

BEER, District Judge.

The Dow Chemical Company[1] ("Dow") instituted this action against American Cyanamid Company[2] ("Cyanamid") seeking injunctive relief and damages based on Cyanamid's alleged infringement of Dow's U.S. Patent No. 3,631,104 ("the '104 patent"), Reissue Patent No. 31,430 ("the '430 reissue patent"), U.S. Patent No. 3,994,973 ("the '973 patent"), U.S. Patent No. 3,642,-894 ("the '894 patent"), U.S. Patent No. 3,758,578 ("the '578 patent"), and Reissue Patent No. 31,356 ("the '356 reissue patent"). Four of these patents, the '104 patent, the '430 reissue patent, which is the

1. The Dow Chemical Company is a corporation existing under the laws of the State of Delaware with its principal place of business in Midland, Michigan, and having a regular place of business in the Eastern District of Louisiana.

2. American Cyanamid Company is a corporation organized and existing under the laws of Maine with its principal place of business in Wayne, New Jersey, and having a regular place of business in the Eastern District of Louisiana.

reissue of the original '104 patent, the '973 patent and the '894 patent, claim the chemical process of hydration [3] of acrylonitrile to acrylamide in the presence of a reduced copper oxide catalyst,[4] and thus are collectively referred to as the "oxide" patents. The remaining two patents, the '578 patent and the '356 reissue patent, which is the reissue of the original '578 patent, claim the process of hydration of acrylonitrile to acrylamide using a catalyst prepared by the reduction of copper salt, and hence are referred to as the "salt" patents.

Cyanamid has denied any infringement, and has counterclaimed for declaration that the Dow patents are invalid, unenforceable and not infringed.

By stipulation of the parties dated January 28, 1985, the damage issues were bifurcated.

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1338(a). Venue is proper in the Eastern District of Louisiana pursuant to 35 U.S.C. § 1400(b).

This case was tried to the Court sitting without a jury from March 21, 1985 through April 3, 1985. Having thereafter considered the very comprehensive briefs and accompanying data and then taken the matter under consideration, I now make the following findings of fact and conclusions of law. To the extent that any findings of fact constitute conclusions of law, they are adopted as such; to the extent that any conclusions of law state findings of fact, they are so adopted.

**3.** A hydration is a reaction in which a molecule of water attaches to another molecule. In this instance, hydration means that a molecule of water attaches itself to the nitrile group (–CN) of acrylonitrile ($CH_2 = CH–CN$) to form acrylamide ($CH_2= CH–CONH_2$).

**4.** A catalyst is a material which will affect a chemical reaction without the catalyst itself being consumed in the reaction. The process of conversion of chemicals in the presence of a catalyst is known as catalysis.

**5.** Catalysts are either homogeneous or heterogeneous. Homogeneous catalysts are used in the

## FINDINGS OF FACT

### I. BACKGROUND

This controversy centers around the processes used by Dow and Cyanamid to manufacture an organic chemical compound known as acrylamide. The acrylamide formed from such processes is of great commercial value in that it can be converted into polymers which presently have varied uses in numerous commercial applications including enhanced oil recovery, municipal and industrial water treatment, pulp and paper processing, textile treatment and food processing.

Beginning in 1954, Cyanamid manufactured acrylamide using a sulfuric acid process. In the sulfuric acid process, acrylonitrile is mixed slowly with sulfuric acid and water under controlled conditions to produce acrylamide sulfate. The acrylamide sulfate is decomposed to acrylamide by reaction with ammonia, resulting in the formation of large quantities of ammonium sulfate as a by-product.

Dow also initially manufactured acrylamide by the sulfuric acid process. However, due to the serious waste disposal problem generated by the formation of by-products in the process, Dow initiated research in 1967 with the purpose of discovering a better method. Dow instructed one of its research chemists, Dr. Ben A. Tefertiller, to research a commercially viable alternate process which would utilize a heterogeneous catalyst.[5]

In reviewing the literature prior to initiating his experimental work, Dr. Tefertiller considered the disclosures on heterogene-

same phase, most often liquid, as the reactants, and the reaction thus occurs anywhere in the reaction mixture. Heterogeneous catalysis involves the use of a material which is in a different phase from that of the reactants. Heterogeneous catalysis usually involves the reaction of gaseous or liquid reactants with a solid catalyst. In heterogeneous catalysis, the reaction takes place on the surface of the catalyst and involves the absorption of the reactants onto the surface, the reaction of such on the surface, and the desorption of the reaction products from the surface.

ous catalysis in Mahan U.S. Patent 2,421,-030; publications of Dr. Watanabe entitled "Studies of Organic Catalytic Reactions II.—The Hydration of Nitriles to Amides With Nickel Catalysts", 37. Bull.Chem. Soc'y Japan, 1325 (1964), "Studies on Organic Catalytic Reactions III.—The Hydration Mechanism of Nitriles to Amides With Nickel Catalysts" 39 Bull.Chem.Soc'y Japan, 8 (1966), (Watanabe III); and also on article by Cook and Forbes entitled "Solid Phase Catalysis of the Hydrolysis of Nitriles to Amides", 5 Chemical Communications, 121 (1966).

Using the heterogeneous catalysis disclosed in the Mahan U.S. Patent 2,421,030, Dr. Tefertiller was unable to convert acrylonitrile to acrylamide in any significant quantities. He then employed metallic nickel catalysts as disclosed by Watanabe for the hydration of acrylonitrile to acrylamide, but found that the major product of that reaction was proplonitrile, a hydrogenated product of acrylonitrile, rather than acrylamide. No further work was done on such catalysts by Dr. Tefertiller.

The Cook et al. reference disclosed the use of manganese dioxide to convert acrylonitrile to acrylamide in methylene chloride. In deviating from the teachings of the Cook et al. article, Dr. Tefertiller discovered that the hydration of acrylonitrile to acrylamide with manganese dioxide catalysts could be improved if the hydration was carried out in the presence of water using a particular form of manganese dioxide. In attempting to develop the use of manganese dioxide, Dr. Tefertiller found that in a continuous reaction system the manganese dioxide quickly became poisoned, resulting in the formation of polymeric by-products. The attempts to use manganese dioxide as a catalyst were consequently abandoned by Dr. Tefertiller.

The initial experimental work of Dr. Tefertiller on review of the literature demonstrated that the closest prior art did not suggest a catalyst which could be utilized in a viable process for the hydration of acrylonitrile to acrylamide. However, in 1967 Dr. Tefertiller, discovered that zinc and cadmium chromites gave encouraging results in the hydration of acrylonitrile. In order to test a wide variety of zinc and cadmium chromites, Dr. Tefertiller, who was now working in collaboration with Dr. Clarence E. Habermann, decided to prepare experimental catalysts. Such preparation included reducing zinc and cadmium chromates with hydrogen to form the corresponding chromites. In late 1968, Dr. Habermann and Dr. Tefertiller discovered that hydrogen reduction of the zinc and cadmium chromates resulted in improved catalytic activity in the hydration of acrylonitrile to acrylamide. In connection with the testing of reduced chromate catalysts for the hydration of acrylonitrile to acrylamide, Dr. Tefertiller and Dr. Habermann jointly discovered that copper zinc compounds, and other copper compounds as well, were active catalysts.

In the period of January to March of 1969, Dr. Tefertiller and Dr. Habermann discovered that reduced copper catalysts obtained by the reduction [6] of copper oxide, when employed in a continuous manner for the hydration of acrylonitrile to acrylamide, resulted in high yields of acrylamide and high conversion of acrylonitrile for long periods of time, without significant formation of by-products. The particular catalysts employed were reduced chromium-copper oxide catalysts which on reduction were passivated by gradual exposure to oxygen to prevent rapid oxidation. These catalysts, furthermore, were tested in continuous unit from which air was excluded during the reaction.

The discovery of using a reduced copper oxide catalyst was recognized to be a breakthrough in technology because of that catalyst's high selectivity in forming

---

**6.** Reduction is a process by which the valance state of a compound is changed. In the case at hand, the valance state of copper contained in the compound is sought to be reduced from one of the copper-plus states to CU°. Thus, divalent cupric oxide ($CU_3O$) is reduced when it forms the monovalent cuprous oxide ($CU_2O$). The cuprous oxide can be further reduced to copper metal (CU). A variety of reducing agents cause this transformation of the two valent copper to the metallic stage, although the one that is preferred and commercially employed is hydrogen.

acrylamide without significant by-product, its high conversion of acrylonitrile to acrylamide and its long life. A number of catalysts obtained by the reduction of various copper compounds, including metallic copper obtained by the reduction of copper oxide were tested. The reduced Harshaw Cu 0203 was found to be the most effective catalyst for the hydration of acrylonitrile to acrylamide, as will be hereafter discussed.

In March of 1969, Dr. Habermann and Dr. Tefertiller, working with Ralph E. Friedrich, discovered that the careful exclusion of oxygen, not only from the reduced catalyst but also from the feed streams, resulted in still further improvements of the yield, selectivity life of the catalyst, and quality of the acrylamide product in its further use to form polyacrylamide. In view of the encouraging results obtained by Dr. Habermann and Dr. Tefertiller, Dow management scaled the laboratory process upward by a factor of almost 300,000, constructing a full scale commercial plant without any intermediate pilot plants which were usually built and tested before design of a full sized plant. In May, 1970, Dow started up its commercial plant using its reduced copper oxide catalyst and has continued to operate it for the commercial hydration of acrylonitrile to acrylamide.

Subsequent to the start-up of Dow's commercial plant, the reactors plugged due to polymerization. Dow formed a task force to define and solve the problem, which had not occurred in the laboratory tests run by Dr. Tefertiller. The plugging due to polymerization was determined to be caused by stagnant areas in the reactors. The plugging was not the result of the chemistry of the process, but rather, the chemical engineering of scaling-up the laboratory invention. Dow's polymerization problem was solved by maintaining a continuous flow of the reaction medium and increasing velocity of the flow by recirculation of the reaction medium.

## II. THE PATENTS IN SUIT

### A. The '104 Patent

Dow sought and obtained patents on its invention, which are here at issue. The '104 patent was applied for in the United States Patent and Trade Office by Dr. Habermann and Dr. Tefertiller on June 23, 1969, as a continuation in-part of an earlier patent application, filed on January 16, 1969, which matured into U.S. Patent 3,597,481 ("the '481 patent"). The '481 patent discloses (in Example 2) the preparation of a catalyst by the reduction of a copper oxide, and (in Example 4) discloses the use of such catalyst in the hydration of acrylonitrile to acrylamide. This was the first U.S. patent disclosure by Dow of reduced copper oxide catalysts.

The '104 patent discloses the use of a copper catalyst obtained by the reduction of copper oxide, copper-chromium oxide, copper-molybdenum oxide or mixtures thereof, in a continuous flow reaction for the hydration of acrylonitrile. The patent was issued on December 28, 1971, as U.S. Patent 3,631,104. The examples of the '104 patent describe the hydration of acrylonitrile to acrylamide using various reduced copper oxide containing catalysts in a continuous flow reactor. Example 8, employing a reduced Harshaw copper oxide catalyst which had been protected from exposure to oxygen, was stated by Dr. Tefertiller, to be the best mode of practicing the invention.

Claim 26 of the '104 patent, which Dow asserts is infringed by Cyanamid, reads, in independent form, as follows:

In a process for converting a nitrile to the corresponding amide by contacting acrylonitrile in the presence of water with a heterogeneous catalyst, the improvement comprising using a cupreous catalyst consisting essentially of reduced copper oxide, reduced copper-chromium oxide, reduced copper-molybdenum oxide, unreduced copper-molybdenum or mixtures thereof.

On January 16, 1970, Dow caused to be filed in Belgium a patent application corresponding in scope to the '481 and the '104 patent, such application having been published in Belgium on July 16, 1970 as Bel-

gian Patent No. 774,543. Example 7 of the Belgian patent corresponds to Example 8 of the '104 patent.

### B. The '894 Patent

The '894 patent was applied for in the United States Patent Office by Dr. Habermann and Dr. Tefertiller on December 5, 1969, as a continuation-in-part of the '104 patent, and issued on February 15, 1972, as U.S. Patent 3,642,894. The '894 patent discloses that catalyst life and product quality in the hydration of acrylonitrile using reduced copper oxide catalyst are improved by protecting the reduced catalysts from contact with oxygen after reduction. Claim 6 of the '894 patent, in independent form, reads as follows:

In the process for catalytically hydrating acrylonitrile to the corresponding amide by contacting a reactant feed of water and acrylonitrile with a reduced copper oxide or reduced copper chromite catalyst, the improvement comprising at least partially protecting the reduced catalysts from contact with oxygen after reduction.

### C. The '973 Patent

On June 28, 1971 Dr. Habermann and Dr. Tefertiller filed, as a further continuation-in-part of the '104 patent, a patent application which issued on November 30, 1976, as U.S. Patent 3,994,973. The '973 patent discloses that for unsaturated nitriles (i.e., acrylonitrile) which tend to polymerize, a reaction temperature of less than about 200° C, a polymerization inhibitor or dilute reaction solutions are desirable to avoid polymerization of the nitrile and possible poisoning of the catalyst. ('973 patent, Column 6, lines 3–7). The patent also discloses, as does the '104 patent and '894 patent, the preference for a continuous flow reaction wherein the rate of flow of reactants over the catalyst is controlled to give desired contact of the reactants with the catalyst. Claim 13 of the '973 patent reads in independent form as follows:

In the process for converting acrylonitrile to the corresponding amide by react-

ing the acrylonitrile with water in the presence of a catalyst, the improvement comprising conducting the reaction in the presence of a catalytic amount of copper prepared by reducing copper oxide.

### D. The '578 Patent

On June 28, 1971, Dr. Habermann and Dr. Tefertiller filed an application disclosing and claiming the use of a reduced copper salt or hydroxide for the hydration of acrylonitrile to acrylamide. That application issued as U.S. Patent 3,758,578. The '578 patent discloses, as does the '973, the preference for a continuous flow reaction, and suggest the dilution of reactants as a means of preventing polymerization. Claim 10 of the '578 patent reads in independent form as follows:

In the process for converting acrylonitrile to the corresponding amide by reacting the acrylonitrile with water in the presence of a catalyst, the improvement comprising conducting the reaction in the presence of a catalytic amount of copper prepared by reducing copper hydroxide or a copper salt.

### E. The '430 Reissue Patent

On February 26, 1981, Dr. Habermann and Dr. Tefertiller filed for a reissue of the '104 Patent in order to have the Patent Office reexamine the patentability of the claims in the light of prior art and other grounds not considered in the original prosecution. The reissue application issued on October 25, 1983 as Reissue Patent No. 31,430. The inventors, Dr. Habermann and Dr. Tefertiller, cited a number of references to the Patent Office for its consideration in the reexamination of the claims including four Watanabe references, the Kobayashi patent publication No. 44–5205, the German Reppe patent No. 552,987 and the Greene et al. patent U.S. No. 3,381,034. In conjunction with the filing of the reissue the inventors also submitted a preliminary argument and an affidavit to remove as a reference the Kobayashi patent publication 44–5205. The affidavit stated that prior to the effective date of the Kobayashi patent

publication Dow's inventor Dr. Habermann had conducted an experiment in which he had reduced copper oxide to essentially copper metal, and had successfully tested such reduced catalyst in the hydration of acrylonitrile to acrylamide.

In response to Dow's submission, the Patent Office did not cite Kobayashi as prior art in its first Office Action. In a later Office Action the Patent Office expressly held the affidavit to be effective in eliminating the Kobayashi patent publication as a reference.

The Patent Office allowed claims 11, 12, 25 and 26 of the '104 patent over the prior art stated, which said claims read on the hydration of olefinic nitriles of 3 to 6 carbon atoms to their corresponding amides. Broader claims referring to aliphatic nitriles were held to be unpatentable over the Reppe German patent. The inventors thus limited the claims of the '430 reissue to the hydration of olefinic nitrites (which includes acrylonitrile) with a cupreous catalyst of copper, copper-oxide, copper-chromium oxide, copper-molybdenum oxide or mixtures thereof. Claims 1, 12, 16 and 26 of the '430 reissue were carried over from the '104 patent and are identical in scope and language to Claims 11, 12, 25 and 26 of the '104 patent. Claim 26 of the '430 reissue patent thus reads in independent form:

> In a process for converting a nitrile to the corresponding amide by contacting acrylonitrile in the presence of water with a heterogeneous catalyst, the improvement comprising using a cupreous catalyst consisting essentially of reduced copper oxide, reduced copper chromium oxide ...

F. The '356 Reissue Patent

On February 26, 1981, Dr. Habermann and Dr. Tefertiller also applied for reissue of the '578 patent. The reissue application was granted by the Patent Office and was reissued on August 23, 1983 as Reissue Patent No. 31,356. The '356 reissue application was filed concurrently with the '430 reissue application and was examined in the Patent Office by the same Examiner.

The same prior art and the same affidavit were submitted to the Patent Office as were submitted in the '430 reissue. In the prosecution of the '356 reissue, similar to the '430 reissue, the Patent Office held claims to the hydration of olefinic nitriles to be patentable over all the prior art cited and held the affidavit effective to eliminate the Kobayashi patent publication as a prior art reference. Claims 1 and 10 of the '356 reissue patent are identical in scope and language to Claims 9 and 10 of the original '578 patent. Claim 10 of the '356 reissue reads in independent form as follows:

> In the process for converting acrylonitrile to the corresponding amide by reacting the acrylonitrile with water in the presence of a catalyst, the improvement comprising conducting the reaction in the presence of a catalytic amount of copper prepared by reducing copper hydroxide or a copper salt.

During the prosecution of the '430 reissue and '356 reissue patents, the U.S. Patent Office reviewed Cyanamid' charges that Dow had engaged in inequitable conduct and fraud on the Patent Office. After investigating the claim, the Patent Office concluded that there was insufficient evidence on which to base a holding of misconduct on the part of Dow or its inventors.

III. CYANAMID'S PROCESS

Cyanamid concedes that it produces acrylamide at its production plant in Fortier, Louisiana, by passing acrylonitrile mixed with water over a heterogeneous metallic copper catalyst. Cyanamid also admits that despite Dow's refusal to license its technology, it utilized a hydrogen-reduced Harshaw Cu 203 catalyst, as disclosed in Example 8 of the '104 patent and in the '973 and '894 patents, at the Fortier plant in 1973 through 1974 and again from late 1977 to mid 1978.

The dispute between the parties thus centers around Cyanamid's current use of a hydrogen-reduced commercial catalyst purchased from BASF Corporation ("BASF"), which is known as the BASF R3–11. Dow claims that Cyanamid's use of

the BASF catalyst infringes its patent because the catalyst contains copper oxide which is reduced to the copper metal state for use as a heterogeneous catalyst, and that malachite contained in the catalyst proceeds through a two-step reduction phase, with the reduction of malachite to copper oxide, and then copper oxide to copper metal. Cyanamid maintains that the catalyst does not contain copper oxide, and that the reduction of malachite proceeds directly to the copper metal state without an intermediate phase of copper oxide.

## A. Cyanamid's Acquisition and Analysis of the BASF Catalyst

In May, 1973, BASF informed Cyanamid that the R3–11 commercial catalyst, when reduced with hydrogen to metallic copper, was a highly efficient catalyst for the hydration of acrylonitrile to acrylamide. BASF claimed that prior to reduction, the catalyst consisted essentially of copper silicate, and therefore was outside of the scope of any Dow patent claims because it did not contain any copper oxide. BASF also claimed that no copper oxide was formed during the reduction phase.

Following receipt of catalyst samples from BASF, Cyanamid conducted x-ray analysis and found, contrary to BASF's assertions, that the catalyst contained both copper oxide and malachite. Further analyses conducted by Cyanamid showed that after being heated for 18 hours at 320°C, the malachite phase was no longer observed and the catalyst was comprised of more copper oxide than the unheated sample. Based on an analysis of the chemical contents of the catalyst, Cyanamid believed that the BASF catalyst was comprised of 34% malachite and 9.7% copper oxide. In internal documents, Cyanamid conceded that the BASF catalyst was not completely free of the Dow patents.

Cyanamid thus requested BASF to produce a copper-oxide free catalyst. In September, 1973, BASF assured Cyanamid that it would be able to supply a catalyst which contained less than 5% of copper oxide as requested by Cyanamid. Dr.

Laszlo Marosi of BASF prepared a report based on his analyses of the catalyst which asserted that the catalyst contained 1–2% copper oxide. Dr. Marosi also testified at trial that he has been unable to detect any copper oxide in the material supplied to Cyanamid for use as a catalyst. With BASF's assertions regarding the nonexistence of copper oxide in the catalyst, Cyanamid took a license under the BASF technology without independently verifying BASF's analyses. In fact, Dr. Siegel of Cyanamid, initially performed tests on the "new" catalyst only to find that it contained 5–10% copper oxide. No further analyses were conducted at that time; instead, Cyanamid relied on BASF's assertions.

## B. Two-Step Reduction of the BASF Catalyst

BASF also informed Cyanamid that the catalyst would reduce directly to copper metal without first passing through an intermediate copper oxide phase by reducing the catalyst at a temperature range of 160°C to 230°C with the gradual introduction of hydrogen. BASF demonstrated that by following this procedure and observing the process with x-ray analysis, the reduction proceeded in one step directly to copper metal. However, Cyanamid's reduction of the catalyst on December 15, 1973, at the Fortier plant indicated that "in actuality, two distinct steady state reduction stages were observed in the plant reactor." (P–192, pg. 3). The first step involved the reduction of malachite and copper compounds to cuprous oxide, and the second step involved the reduction of the cuprous oxide to copper metal. Based on these experiments, Cyanamid knew (or should have known) that the BASF catalyst was reduced by the same two step procedure, as was the Harshaw Cu 203 catalyst.

Prior to trial, Cyanamid again ran analyses of the reduction of the BASF catalyst at a temperature of 210°C, which is in accordance with the reduction process used at the Fortier plant. Cyanamid's expert witness testified that the reduction oc-

curred so rapidly that there was no "visual" evidence in the analyses employed to indicate that an intermediate phase of cuprous oxide was formed during the reduction. Based on this alleged lack of visual or graphic verification, Cyanamid's experts concluded that the copper components comprising the catalyst reduced directly to copper metal without first passing through an intermediate copper oxide phase.[7]

## C. Dow's Analyses of the BASF Catalyst

Dow's visual inspection under a microscope of the R3–11 catalyst as purchased by Cyanamid from BASF reveals dark brown areas which are rich in copper oxide, and light blue and green areas which are mainly malachite. The visual examination conducted by Cyanamid in 1973 also showed the catalyst to exhibit the same appearance. These independent visual inspections of the BASF R3–11 catalyst show that no significant change in catalyst composition took place between 1973 and 1984.

Tests performed by Dow in 1983–84 established the malachite (basic copper carbonate) content to be 31%. Cyanamid's tests at this time period established the malachite to be 35.4% in one test and 30.3% in another test. The malachite content of the BASF catalyst as determined by Cyanamid in 1973 was 34%. Thus, Cyanamid's malachite determinations in 1973 and 1984 show that no significant changes have taken place in the malachite content of the catalyst.

Dow established by quantitative x-ray analysis that the current BASF R3–11 catalyst employed by Cyanamid contains 14% copper oxide. The reliability of Dow's x-ray data was confirmed by independent elemental analyses. The analyses conducted by Dow demonstrate that substantially all of the copper present in the catalyst is accounted for by the copper in the copper oxide and by the copper in the malachite.

No significant quantities of other copper compounds are traceable.

Dow also performed analyzes proving that the reduction of the BASF R3–11 catalyst proceeds through two-steps with the intermediate formation of copper oxide. X-ray analysis conducted by Dow's Dr. Timothy G. Fawcett on the BASF R3–11 catalyst demonstrates that when the catalyst is reduced at 300°C the reduction takes place in two steps with the intermediate formation of a copper oxide which is then reduced to copper metal. The fact that Dr. Fawcett's reduction experiment was conducted by 300°C does not affect its validity. The chemistry is essentially the same whether the reaction is carried out at 210°C or 300°C, with the intermediate formation of copper oxide. In reaching this conclusion, I have relied on the testimony of Dr. Ludo Frevel who I found to be entirely credible.

Dr. Fawcett further analyzed an x-ray photographic diffractogram generated by Dr. Marosi under conditions closely approximating those of the Cyanamid reduction process for the R3–11 catalyst. This analysis established that cuprous oxide forms as an intermediate in the reduction process.

Dow's analytical evidence thus establishes that the BASF catalyst contains both copper oxide and malachite, and reduces to copper metal by a two-step reduction which includes the formation of an intermediate cuprous oxide before going to the metal state.

## CONCLUSIONS OF LAW

Cyanamid argues that Dow's patents are invalid for the following reasons: 1) obviousness under 35 U.S.C. § 103; 2) failure to disclose the best mode of invention under 35 U.S.C. § 112; and 3) inequitable conduct and fraud on the Patent Office. Dow asserts that the patents are valid and that certain claims are infringed by Cyanamid. The validity of the patents will be

---

**7.** For such use as a reviewing court may wish to accord my observations on this point, I feel obliged to say that I felt Cyanamid's experts were somewhat equivocal in their testimony. They obviously did not want to be untruthful and thus, they struggled mightily to "reach conclusions" rather than come directly to grips with the issue.

addressed first, and thereafter infringement.

## I. PRESUMPTION OF VALIDITY

The starting point in analyzing a challenge to the validity of a patent is the presumption that the patent is valid, 35 U.S.C. § 282, with the burden of demonstrating invalidity by clear and convincing proof resting on the party asserting it. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed.Cir.1984). Cyanamid, therefore, has the burden of demonstrating, by clear and convincing evidence, the invalidity of the patents-in-suit and the invalidity of each claim it seeks to destroy. *See, Shelcore Inc. v. Durham Industries*, 745 F.2d 621 (Fed.Cir.1984).

■ While an Examiner's decision on an original reissue application is not binding on a court, it is evidence that the court considers in determining whether the presumption of validity has been overcome. In this case, the Examiner for the U.S. Patent & Trade Office considered all of the relevant prior art and Cyanamid's contention of fraud in the prosecution of the patents. Since no prior art other than that which was considered by the Patent Office Examiner is relied on by Cyanamid in its defense, it "has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job." *American Hoist*, 725 F.2d at 1359. Cyanamid has failed to meet its burden of proof, and thus the patents in suit have not been proved invalid on the various grounds asserted by Cyanamid.

## II. OBVIOUSNESS—33 U.S.C. § 103

33 U.S.C. § 103 provides that:

"A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains ..."

In assessing the nonobviousness or obviousness of a patent invention, certain factual inquiries are determined: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) so-called "secondary" considerations, such as long felt need, unexpected results, commercial success and failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). These secondary considerations, when present as they are in this case, are especially helpful in determining nonobviousness of a patent without falling prey to hindsight reasoning. *Atlas Powder Co. v. E.I. DuPont DeNemours and Co.*, 750 F.2d 1569, 1574 (Fed.Cir.1984).

The pertinent prior art includes the German Reppe patent, four Watanabe references, the Greene, et al. patent, a Haefele patent and a 1967 lecture.[8] The German Reppe patent No. 522,987, entitled "Method for Hydrogenation of Nitriles of Unsaturated Acids", issued to Walter Reppe, et al. in 1932, the U.S. cognate being U.S. Patent No. 1,891,055. The Reppe patent teaches that metallic copper catalysts made by the reduction of copper compounds, such as copper carbonate, copper oxide or copper hydroxide are useful for the hydrogenation of unsaturated nitriles to the corresponding saturated nitriles. The Reppe patent also discloses that after the hydrogenation and separation of the catalyst from the reaction mixture, the saturated nitrile can be converted to the amide by the addition of water or water vapor using standard reaction methods. Reppe does not teach the reaction of a nitrile with water over the copper catalysts, and does not disclose the hydration of acrylonitrile to acrylamide using a reduced copper compound as a catalyst.

In 1959, Dr. Watanabe of Tokyo Metropolitan University published an article entitled "Studies of Organic Catalytic Reac-

---

**8.** Since this Court agrees with and accepts the findings of the U.S. Patent Office in eliminating Kobayashi as prior art, there is no need to detail the teachings of the Kobayashi reference.

tions" (Watanabe I), 32 Bull.Chem. Soc'y. Japan, 1280 (1959), in which Watanabe described the use of metallic nickel catalysts for the conversion of some aromatic nitriles to their corresponding amides. In that article, the author also indicated that metallic copper catalysts could be used but stated that they were not as useful because of undesirable side reactions. In a second article entitled "Studies on Organic Catalytic Reactions II.—The Hydration of Nitriles to Amides with Nickel Catalysts", 37 Bull.Chem.Soc'y. Japan, 1324 (1964), Dr. Watanabe disclosed that the hydration of aliphatic nitriles was somewhat complicated and different from that of aromatic ones, and that the hydration was accompanied by side reactions forming acidic compounds. With respect to the use of metallic copper, Dr. Watanabe indicated that such materials gave poor results as catalysts for hydration and sometimes caused unexpected side reactions. In addition, Dr. Watanabe stated that some metallic copper species failed to give any hydration of nitriles to amides, but formed large amounts of complexes of corresponding amines. In addition, Dr. Watanabe taught that the catalysts could be exposed to air during their preparation and that city water could be used for their preparation. The reference does not disclose the hydration of acrylonitrile to acrylamide with a reduced copper compound as a catalyst.

The Watanabe reference entitled "Studies on Organic Catalytic Reactions III.—The Hydration Mechanism of Nitriles to Amides with Nickel Catalysts", 39 Bull. Chem.Soc'y. Japan, 8 (1966), confirmed Watanabe's earlier report that aliphatic nitriles gave poor results in his attempts to convert such to amides with nickel catalysts. Catalysts other than the nickel catalysts employed by Watanabe gave poor results with all nitriles. The reference does not disclose the hydration of acrylonitrile to acrylamide with a reduced copper compound as a catalyst.

The third Watanabe reference, entitled "Novel Reduction of Various Organic Compounds with Water in the Presence of Precipitated Metals", 41 Bull.Chem.Soc'y. Japan, 1902 (1968), discloses that metallic nickel and, to a lesser extent, metallic copper, would convert aromatic nitriles to amines instead of amides and that the same nickel catalysts convert unsaturated carbon-carbon double bonds to saturated bonds when such organic materials are reacted with water.

In 1968, United States Letters Patent 3,381,034, entitled "Process for Hydrolyzing Nitriles", was issued to Janice L. Greene, et. al. The Greene, et al. patent taught that soluble copper ions would convert aromatic and aliphatic nitriles, including acrylonitriles, to their corresponding amides; it stated, however, that metallic copper alone was not an effective catalyst for converting acrylonitrile to acrylamide.

In January of 1968, United States Letters Patent 3,366,639 issued to Haefele disclosed the use of large amounts of manganese dioxide as a catalyst with an organic solvent to convert nitriles, including acrylonitrile, to the corresponding amide. The reference does not disclose the use of a reduced copper compound to catalyze the hydration of acrylonitrile to acrylamide.

The 1967 Lectures teach how to prepare metallic copper catalysts, but do not disclose the use of such catalysts in the hydration of a nitrile to an amide. These references are merely cumulative to the Reppe patent already discussed. The '104 patent in Column 2 acknowledges that the copper catalysts employed are known and can be prepared by conventional methods.

I conclude that there are differences between the subject matter claimed by Dow in the patent-in-suit and the prior art when taken as a whole, and that such differences would not be obvious to those skilled in the art. First, the references teach that the conversion of a nitrile to its corresponding amide is affected by the type of metal catalyst employed. The Greene et. al. reference taught explicitly that copper metal is not an effective catalyst for such a conversion. Thus, the hydration of nitriles by the use of a copper catalyst obtained through the reduction of

a copper compound was not predictable, and was not obvious. Secondly, the inventions claimed in the Dow patents are limited to the conversion of certain unsaturated nitriles, particularly acrylonitrile to its corresponding unsaturated amide. The process claimed in the Dow patents, therefore, differ from the prior art in the nature of the nitrile hydrated and the nature of the resultant amide. The difference in the chemical nature of the unsaturated nitriles claimed in the Dow patents, as compared to the saturated and aromatic nitriles [9] shown in the art, confirms that Dow's inventions were not obvious.

Secondary considerations of nonobviousness further support the conclusion that the Dow patents are valid. The long-felt need to find a better way to manufacture acrylamide than the then-existing sulfuric acid process is evidenced by the research efforts of Dow and Cyanamid. Both parties sensed the compelling need to develop a better method because of the waste disposal problem generated by the sulfuric acid process. Dow's efforts were successful, not only scientifically, but also commercially in that Dow was able to build a full-size plant utilizing its patented invention that replaced the sulfuric acid process. Further, Cyanamid admits that it utilized the process disclosed in the patent specifically with a Harshaw Cu 203 catalyst, thus indicating Cyanamid's frustrations in not being able to develop its own process based on prior art. These factors indicate that Dow's patented invention is not obvious in view of prior art.

## III.   BEST MODE—35 U.S.C. § 112

Under 35 U.S.C. § 112, the applicant for a patent must include in his application a specification containing a "written description of the invention" setting "forth the best mode contemplated by the inventor of carrying out his invention." The best mode required to be disclosed is the best mode of practicing the invention that is known to the inventor at the time the appli-

cation for the patent is filed. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed.Cir.1983).

Cyanamid contends that the Dow patents are invalid for failure to disclose the best mode in that Dow did not disclose the problems of polymer formation and subsequent plugging of the reactor due to polymerization, and that Dow did not disclose that maintaining a high linear velocity of fluid through the reactor eliminates the polymer formation and subsequent plugging.

■  However, the essence of the invention in the Dow patents is the use of a reduced copper compound as a catalyst in the conversion of an unsaturated nitrile of its corresponding unsaturated amide, and not a method to prevent polymerization. Patents are written for those skilled in the relevant art, and thus, an applicant need not divulge every piece of information which a lay person would need to operate the invention most effectively.

The problem of polymer formation did not exist until 1971, significantly later than the filing dates of the applications maturing into the '104 and '894 patents. The disclosure in Example 8 of the '104 patent satisfies the best mode requirement as this method was the best way of practicing the invention at the time the application was made. The '430 reissue patent also is not invalid for disclosing the best mode, as it is the reissue of the original '104 patent, and no new matter can be added to a patent in a reissue proceeding. 35 U.S.C. § 251. Even though the polymerization problem had not occurred at the time of filing the application, the '104 and '894 patents disclose the preference for a continuous flow reaction wherein the rate of flow of reactants over the catalyst is controlled to give desired contact of the reactants with the catalyst. This disclosure satisfies the best mode requirement since the use of continuous flow of reactant mixtures was later found to prevent polymerization.

---

**9.**  Acrylonitrile and acrylamide are, respectively, unsaturated aliphatic nitriles and unsaturated amides, and hence, differ chemically from saturated nitriles and amides.

■ The later patents, the '973, the '578 and the reissue '356 specifically disclose that in hydrating unsaturated nitriles (i.e., acrylonitrile) which tend to polymerize, a reaction temperature of less than 200°C, a polymerization inhibitor or the dilution of reaction solutions are desirable to avoid polymerization of the nitrile and subsequent poisoning of the catalyst. These patents also disclose the preference for continuous flow of reactant mixtures. The disclosure of a specific rate of flow of the reactant mixture is not necessary in order to meet the best mode requirement. "Where one of ordinary skill in the art would know how to select operating conditions so as to achieve a particular result, the failure to include a recitation of some specific operating conditions in the specification cannot give rise to a rejection ... under the 'best mode' requirement of 35 U.S.C. § 112." *In re: Karnofsky*, 390 F.2d 994, 997 (C.C.P.A.1968), *see also General Motors Corp. v. U.S. International Trade Commission*, 687 F.2d 476 (C.C.P.A.1982). Further, the best mode requirement does not require the inventor to disclose production details so long as the means to achieve the inventive results are disclosed. *International Telephone & Telegraph v. Raychem Corp.*, 538 F.2d 453, 460 (1st Cir. 1976), *cert. denied*, 429 U.S. 886, 97 S.Ct. 238, 50 L.Ed.2d 167 (1976). *See also McGill, Inc. v. John Zink Co.*, 736 F.2d 666 (Fed.Cir.1984).

Here, Cyanamid's ability to copy and design a commercial process, and successfully manufacture acrylamide based on Example 8 of the '104 patent using the Harshaw Cu 203 catalyst confirms that Dow's patents-in-suit meet the best mode requirements.

## IV. INEQUITABLE CONDUCT

Cyanamid maintains that Dow engaged in inequitable conduct in the prosecution of its patents and reissue patents by failing to disclose prior known art, and then by fraudulently misrepresenting the nature of the catalyst used in experiments which were disclosed in an affidavit which caused the Patent Office to eliminate the Kobayashi reference.

■ A breach of the duty of candor owed to the U.S. Patent and Trade Office which renders a patent unenforceable occurs when material information is misrepresented or withheld, and such misrepresentation or withholding is intentional or accompanied by gross negligence or bad faith. *Hycor Corporation v. The Schleuter Co.*, 740 F.2d 1529, 1538 (Fed.Cir.1984). To establish inequitable conduct as a defense rendering a patent unenforceable, the party asserting this defense must prove, by clear and convincing evidence, the thresholds of materiality and intent. *Atlas Powder Co. v. E.I. DuPont DeNemours & Co.*, 750 F.2d 1569, 1578 (Fed.Cir. 1984). Cyanamid has failed to demonstrate that Dow engaged in fraudulent conduct when prosecuting its patent claims. Since Cyanamid has failed in its burden of proof, this Court concludes that the '104, '587, '973 and '894 patents were duly and lawfully issued, and the '430 and '578 reissue patents were duly and lawfully reissued.

## V. INFRINGEMENT

35 U.S.C. § 271(a) provides that:

"... whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

Dow asserts that the inventions covered by Claim 26 of the '104 patent and of the '430 reissue, Claim 6 of '894 patent, Claim 13 of the '973 patent and Claim 10 of the '578 patent and the '356 reissue of its patents have been copied by Cyanamid for the manufacture of acrylamide without license from Dow or lawful right.

■ The claims of a patent set forth the formal definitions of the invention and must be looked to in determining if there has been infringement. *Autogiro Co. of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55 (1967). Although the claims define the bounds of the patent, this Court is not confined to the language of the

claims in interpreting their meanings. *Rel-Reeves, Inc. v. United States*, 534 F.2d 274, 209 Ct.Cl. 595 (1976). However, claim interpretation should be done on a reasoned basis to avoid unjust results. *Emery Industries v. Schumann*, 111 F.2d 209 (7th Cir.1940).

In determining whether there is an infringement of the patent by the accused process, the meaning of the claims in issue must first be ascertained. In interpretating the claims, it must be noted that terms of art in the claims specifically "comprising" and "consisting essentially of" have been previously defined. The term "comprising" permits the inclusion of other steps, elements or materials in addition to the elements or components specified in the claims. *In re: Baxter*, 656 F.2d 679, 686 (C.C.P.A.1981). The term "consisting essentially of" limits the scope of the claims to the specified ingredients, and those that do not materially affect the basic and novel characteristics of a composition. *In re: Herz*, 537 F.2d 549, 551 (C.C.P.A.1976).

Claim 26 of the '104 patent and of the '430 reissue patent reads, in independent form, as follows:

In a process for converting a nitrile to the corresponding amide by contacting acrylonitrile in the presence of water with a heterogeneous catalyst, the improvement comprising using a cupreous catalyst consisting essentially of reduced copper oxide, reduced copper chromium oxide...

The issue of infringement with respect to this claim is whether the metallic copper in Cyanamid's reduced BASF R3–11 catalyst is obtained substantially or entirely through the reduction of copper oxide. Dow has proved by a preponderance of the evidence that the metallic copper in the reduced BASF catalyst is derived entirely from the reduction of copper oxide initially present in the catalyst and from copper oxide formed by the reduction of the malachite present in the catalyst. Accordingly, Claim 26 of the '104 patent and of the '430 reissue, as well as Claim 12, which reads, in

pertinent part: "Contacting acrylonitrile in the presence of water with a heterogeneous cupreous catalyst consisting essentially of copper prepared by reducing copper oxide," have been infringed upon by Cyanamid.

Claim 6 of '894 patent reads, in independent form, as follows:

In the process for catalytically hydrating acrylonitrile to the corresponding amide by contacting reactant feed of water and acrylonitrile with a reduced copper oxide or reduced copper chromite catalyst, the improvement comprising at least partially protecting the reduced catalysts from contact with oxygen after reduction.

The issue relative to infringement of this claim is whether Cyanamid's process and catalyst comply with exact terms of the claim. Dow has proved by a preponderance of the evidence that the BASF catalyst is a reduced copper oxide catalyst and that Cyanamid does protect the catalyst from exposure to oxygen after reduction and during hydration. Accordingly, Claim 6 of the '894 patent has been infringed by Cyanamid.

Claim 13 of the '973 patent reads, in independent form, as follows:

In the process for converting acrylonitrile to the corresponding amide by reacting the acrylonitrile with water in the presence of a catalyst, the improvement comprising conducting the reaction in the presence of a catalytic amount of copper prepared by reducing copper oxide.

This claim differs from Claims 12 and 26 of the '104 patent in that it allows the presence of other catalytic species, but is infringed so long as catalytic amounts of copper obtained by the reduction of copper oxide are present. Dow has proven by a preponderance of evidence that the conditions called for by Claim 13 are satisfied by Cyanamid's process in utilizing the reduced copper oxide BASF catalyst; thus, this claim has also been infringed.

Claim 10 of the '578 patent and the '356 reissue patent reads, in independent form, as follows:

In the process for converting acrylonitrile to the corresponding amide by reacting the acrylonitrile with water in the presence of a catalyst, the improvement comprising conducing the reaction in the presence of a catalytic amount of copper prepared by reducing copper hydroxide or a copper salt.

Claim 10 of the '578 patent and the '356 reissue differs from previously discussed Claim 26 of the '104 patent in two respects. First, said Claim 10 requires that a catalytic amount of copper in the catalyst be prepared by direct reduction of copper hydroxide or a copper salt; and second, the use of "comprising" permits the inclusion of other catalytic components in addition to the required catalytic amount of copper. The use in Cyanamid's process of a copper catalyst obtained by direct reduction of a copper salt would constitute infringement of said Claim 10. However, since this Court has found that the metallic copper of Cyanamid's reduced BASF catalyst is produced by the reduction of copper oxide, the Cyanamid process does not infringe said Claim 10 of the '578 and the '356 reissue patents.

■■■ Although this Court has found that Cyanamid's process utilizing the BASF reduced copper oxide catalyst literally infringes Dow's '104 patent and '430 reissue, '894 patent and '973 patent, it must be further noted that Cyanamid's process also infringes the claims of these patents under the doctrine of equivalents. The doctrine, designed to protect a patentee from an infringer who appropriates the invention but avoids the literal language of the claim, allows a finding of infringement when the accused product and claimed invention performs substantially in the same way to yield substantially the same results. *Gravier Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed.2d 1097 (1950); *Atlas Powder Co. v. E.I. DuPont deNemours*, 750 F.2d 1569, 1579 (Fed.Cir.1984). Cyanamid's use of the BASF catalyst performs the same process claimed in the Dow oxide patents in the same way disclosed, particularly since Cyanamid utilizes a reduction process and protects the catalyst from oxygen. Fur-

thermore, Cyanamid's process utilizing the allegedly revised BASF catalyst produces high yields of pure acrylamide from the hydration of acrylonitrile, as does the Dow process disclosed in the invention.

Initially, Cyanamid realized that the original catalysts supplied by BASF contained copper oxide and other copper compounds which, when reduced, went through an intermediate copper oxide phase. The revised catalyst supplied by BASF allegedly contained no copper oxide or a miniscule amount so as to not infringe the patent. Regardless of BASF's assertion, it is apparent that the original BASF catalyst and the alleged revised catalyst utilized in Cyanamid's process are obtained by the reduction of a copper compound, particularly malachite, with hydrogen. Both catalysts performed the same function in the same way with the same results, namely, the prosperous production of great yields of acrylamide with little or no by-product. The presence of malachite in the non-reduced catalyst does not allow Cyanamid to avoid infringement of the patents, especially since this Court has found that when reduced, the malachite in the BASF catalyst proceeds through an intermediate copper oxide phase.

## VI. INJUNCTION—35 U.S.C. § 154

■■■ The remedy of injunction for infringement is granted to the patent owner under 35 U.S.C. § 154, Congress having thus recognized that a patentee whose claims have been infringed should be entitled to exclude others, and reserve to himself, the right to practice his invention. Here, in view of Cyanamid's infringement of the patents in suit, Dow is entitled to an injunction enjoining Cyanamid for the remaining respective terms of the patents in suit from committing any further acts of infringement.

■■■ I find, however, that Cyanamid's infringement did not reach the degree of calculated and willful infringement which I perceive to be the basis for awarding treble damages and attorney fees under 35 U.S.C.

§§ 284 and 285, providing for such relief in "exceptional" cases.[10] The remaining issue of damages, by stipulation of the parties, has been bifurcated, and therefore remains to be tried.

Counsel for Dow is hereby instructed to prepare a judgment in accordance with the foregoing.

---

**10.** This is not to condone (my perception of) the relationship that existed between Cyanamid and BASF. Even the "tests" which Cyanamid used to "confirm" its comprehension that the BASF process did not infringe were, I think, marginal at best. But such doubts as I have had are not quite able to successfully compete with the presumption of moral regularity that Cyanamid is entitled to.