**ROGERS CORPORATION**

v.

**ARLON, INC.**

**Civ. Nos. 2:91cv1166 (PCD), 2:92cv0995 (PCD).**

United States District Court, D. Connecticut.

March 29, 1994.

---

**6.** All three decisions are noted to predate the denial herein.

Michael A. Cantor, Fishman, Dionne & Cantor, Windsor, CT, for Rogers Corp.

David T. Ryan, Robinson & Cole, Hartford, CT, E. Alan Uebler, Wilmington, DE, Anthony M. Fitzgerald, Carmody & Torrance, New Haven, CT, for Arlon, Inc.

## RULING ON PENDING MOTIONS

DORSEY, District Judge.

Plaintiff ("Rogers") filed Civil No. 2:91CV01166 against Arlon, Inc. ("Arlon") alleging infringement of U.S. Patent 4,849,284 ("the '284 patent" or "the patent"). Arlon denies infringement and counterclaims for (1) a declaratory judgment that the patent is not infringed and is invalid and unenforceable, (2) antitrust violations, and (3) trade libel. Following extensive discovery, Arlon moves for summary judgment of invalidity and unenforceability and that certain of the patent claims are invalid. Rogers moves for summary judgment of infringement of claim 8 of the patent and as to Arlon's counterclaims.

Civil No. 2:92CV00995 is a subsequent suit, now consolidated, instituted by Rogers alleging unfair competition, misappropriation of trade secrets under common law and the Connecticut Uniform Trade Secrets Act, Conn.Gen.Stat. § 35–50 *et seq.*, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), Conn.Gen.Stat. § 42–110a *et seq.* by Arlon. Both parties move for summary judgment on all issues presented in this second action.

## I. BACKGROUND

In 1984, Rogers, a materials company, formed Rogers High Speed Interconnections (ROHSI) to address needs for high speed interconnections for computers and electronic equipment. One ROHSI program, RO2800, was intended to produce new circuit board materials combining the low dielectric constant, low dissipation factor and low coefficient of thermal expansion (CTE) needed for high speed systems using complex multilayer circuit boards and surface mounted components. The goal was to develop a fluoropolymer based circuit board laminate suitable for both high speed digital and microwave applications.

David Arthur, who was in charge of RO2800, initiated the filing of a patent application on February 17, 1987, for the patent in suit. The patent discloses an electrical substrate material with a fluoropolymeric base, a ceramic filler, a silane coating on the ceramic filler, and at least one layer of metal disposed on at least a portion of the substrate.

The action for patent infringement was filed on December 16, 1991. Arlon was also involved in efforts to bring to market new circuit board materials. Approximately one year later, in Civil No. 2:92CV00995, Rogers alleged that Arlon received from an employee of plaintiff confidential proprietary business information which was disseminated among its employees. The second action is based entirely upon a document obtained by plaintiff through discovery in Civil No. 2:91CV01166. It is designated "PDX–121" and allegedly contains Rogers' trade secrets. PDX–121 is a hand-written record by Theodore Tschida, an Arlon salesman, of his telephone conversation with a Rogers employee named "Patti."

## II. DISCUSSION

### A. Summary Judgment Standard

■ Summary judgment under Fed. R.Civ.P. 56 is appropriate in patent cases, as in other cases, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See SRI Int'l v. Matsushita Electric Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985); *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 653–54 (Fed.Cir.1984); *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986). The burden is on the moving party to show that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987). A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992). The court's role in considering a motion for summary judgment is not to resolve disputed issues, but rather to determine the existence of factual issues to be tried. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

### B. Arlon's Motion for Summary Judgment of Invalidity and Unenforceability

Arlon contends that the patent is invalid under 35 U.S.C. § 102(b) because Rogers sold, offered for sale and/or disclosed publicly the invention claimed more than one year before the application was filed in the United States Patent and Trademark Office (PTO). Arlon further charges plaintiff and its agents with inequitable conduct before the PTO prior to issuance of the patent.

#### 1. Validity

■ A patent is presumed valid. 35 U.S.C. § 282. Arlon alleges that the patent lacks the novelty required to be patentable.

A person shall be entitled to a patent unless—

. . . .

(b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102.

Here, the "critical date" is February 17, 1986, one year prior to the filing of the patent application. Arlon alleges that prior to that date, Rogers offered and sold RO2800 to Sperry Corporation and to Digital Equip-

ment Corporation (DEC), and made a public disclosure of it to Control Data Corporation (CDC). Arlon argues that such transactions bar patentability under § 102(b).

■ An on-sale bar must be proven by "clear and convincing evidence." *Envirotech Corp. v. Westech Engineering, Inc.*, 904 F.2d 1571 (Fed.Cir.1990). Whether an invention is on sale is a question of law based on the "totality of the circumstances." *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 860 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). A mere offer to sell the invention more than a year before the filing date satisfies § 102(b) and bars issuance of the patent. *Id.*

A patentee may avoid § 102(b) if the primary purpose of the use or sale was experimental. *LaBounty Manufacturing, Inc. v. Int'l Trade Comm'n*, 958 F.2d 1066 (Fed.Cir. 1992); *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1563 (Fed.Cir.1987).

[A] use or sale is experimental for purposes of Section 102(b) if it represents a bona fide effort to perfect the invention or to ascertain whether it will answer its intended purpose.... If any commercial exploitation does occur, it must be merely incidental to the primary purpose of experimentation to perfect the invention.

*LaBounty*, 958 F.2d at 1071, quoting *Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573, 1580–81 (Fed.Cir.1984). A device may be:

used in the premises of another, and the use may inure to the benefit of the owner of the establishment. Still if used under the surveillance of the inventor and for the purpose of enabling him to test the machine, and ascertain whether it will answer the purpose intended, and make such alterations and improvements as experience demonstrates to be necessary, it will still be a mere experimental use, and not a public use, within the meaning of the statute.

*TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d 965, 970–71 (Fed.Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984).

■ Factors deemed significant in determining whether activities prior to the critical date were experimental or an on-sale or public use, include the existence of secrecy obligations, the extent of any evaluation and monitoring, record-keeping, length of the test period in relation to test periods of similar devices, whether payment is made, and whether persons other than the inventor conducted the experiments, *TP Laboratories*, 724 F.2d 965, *In re Brigance*, 792 F.2d 1103 (Fed.Cir.1986), the extent of control by the inventor and the existence of promotional activities, *U.S. Environmental Products, Inc. v. Westall*, 911 F.2d 713 (Fed.Cir.1990), restrictions on the use of the product and retrieval of the product, *In re Smith*, 714 F.2d 1127, 1137 (Fed.Cir.1983). The § 102(b) bar is avoided if sales are associated with primarily experimental activities conducted in the course of completing the invention. *Baker Oil Tools*, 828 F.2d at 1563.

■ On October 9, 1985, David Arthur sent Charles Freeman of Sperry Corporation a quotation for 300 laminates at $35,000 and specified terms of payment. Arthur wrote that the material was:

currently manufactured under R & D and Engineering control and is not yet commercially available.... It is our understanding that this material will be used for experimental purposes only by Sperry to evaluate the feasibility of manufacturing complex multilayer boards with this material.

The 300 laminates were manufactured by Rogers and shipped to Sperry in December, 1985. This transaction was referred to in the Rogers annual report for 1985 as the "first sales of R0–2800, for evaluation in an advanced mainframe computer." Defendant's exh. 6; Arthur deposition at 608–9.

Also prior to February 17, 1986, Rogers sent R02800 circuit boards to DEC and CDC. Arlon contends that these three transactions place the invention on sale within the meaning of § 102(b).

Rogers argues that in order to test its laminate effectively, it was necessary to seek out "development partners" in its perceived market, *i.e.*, computer and other electronic companies that were end-users of circuit boards. Rogers argues that while it had

expertise in the design and processing of materials, only third parties such as Sperry were capable of manufacturing the laminate into prototype complex multilayer circuit boards in order to verify that it was suitable for such purposes and that it had the desired thermal, mechanical and electrical properties. Rogers contends that it charged Sperry and DEC a portion of the cost of producing the laminate to defray overall costs and to initiate cost sharing as an incentive.

The prototype multilayer circuit boards manufactured by Sperry from the laminates were useful solely to evaluate, test and assess the R02800 materials. They contained only test circuit patterns and had no utility in a commercial device (*e.g.,* a computer under design by Sperry). Thus when its third party evaluation was completed, the R02800 board prototype had no further application.

At the time of these transactions, R02800 could not be ordered or received without a secrecy agreement and the understanding that Rogers would monitor all testing and evaluation. Rogers received written reports and required the return of the materials after testing. Rogers also required confidentiality agreements regarding the testing, evaluating or characterizing of R02800 materials. *See* Plaintiff's exhs. 6–10, 31, 53, 54. While the Sperry secrecy agreement produced in evidence expired in 1985, *see* defendant's exh. 25, Rogers argues that an understanding as to secrecy was maintained, and all ambiguities must be resolved against Arlon on its motion for summary judgment.

Although the 1985 annual report does use the word "sales," it also made it clear that the R02800 was "sampled" to "selected" end users for "evaluation" in test circuit boards. Defendant's exh. 6. The product molecule at the end of the report does not include reference to R02800. Plaintiff's exh. 44. Nor did the 1985 10–K filing by Rogers mention R02800 as part of Rogers' product line. Plaintiff's exh. 9, defendant's exh. 6.

The totality of the circumstances shows that the Sperry, DEC and CDC transactions were experimental and do not sustain an on-sale or public use bar under § 102(b). Commercial exploitation was incidental. Underlying experimental purposes are shown by the evidence, including record keeping, control by Rogers, and the inutility of the samples other than for testing.

### 2. *Enforceability*

■ Defendant argues that the patent is unenforceable because plaintiff violated its duty of candor and good faith. If there is clear and convincing evidence that an applicant withheld material information from the PTO intending to affect the allowance of claims, any patent would unenforceable. *LaBounty Mfg.,* 958 F.2d at 1070. Information is material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow a patent to issue. *Norton v. Curtiss,* 433 F.2d 779 (C.C.P.A.1970).

> Inequitable conduct resides in failure to disclose material information, or submission of false material information, with an intent to deceive, and those two elements, materiality and intent, must be proven by clear and convincing evidence.

*Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989).

■ Arlon argues that in connection with plaintiff's application, Arthur submitted an untrue declaration which omitted information concerning Rogers' commercial relationship with Sperry. The declaration stated that:

> R02800 has been in a continuous state of development and evaluation until at least as late as October 1986. Prior to October 1986, the material was still being tested, evaluated and developed and was not; nor could it have been placed "on sale" or "in public use."

Defendant's exh. 25, ¶ 4. Attached was a copy of an unsigned letter dated October 8, 1985 from Arthur to Sperry. The actual signed letter was dated one day later and contained two items not in the submitted letter: (1) that "[t]his material is currently manufactured under R & D and Engineering control and is not yet commercially available," and (2) that the "terms of payment are net thirty (30) days, FOB Chandler, Arizona. Deliveries could begin six (6) weeks ARO.

Prices are valid for ninety (90) days." Arlon argues that a reasonable examiner would have found these divergences, along with plaintiff's failure to submit the 1985 annual report and reports of the transactions with DEC and CDC, material to patentability.

It cannot be determined as a matter of law that Rogers did not provide the PTO with information that a reasonable examiner would have found to be material. Arthur claims that he inadvertently enclosed a draft of the letter to Sperry with his declaration. The letter sent to the PTO clearly indicated that Rogers was sending Sperry 300 laminates at a charge of $35,000. Hence the PTO was informed of a third party transaction involving an exchange of money for the laminates. It cannot be found as a matter of law that information about the pricing details was material. Moreover, the statement of the commercial unavailability of the material could only have helped Rogers' quest for a patent, suggesting that its omission was inadvertent.

Regarding the CDC and DEC transactions, Rogers notified the PTO that it sent samples to third parties for evaluation, plaintiff's exh. 45. It cannot be determined as a matter of law that further elaboration was required. Arlon's motion for summary judgment of invalidity and unenforceability is denied.

## C. *Rogers' Motion for Partial Summary Judgment*

Rogers moves for summary judgment that Arlon infringed claim 8 of the patent and as to Arlon's counterclaims: invalidity (anticipation, improper inventor, prior invention, obviousness, enablement and indefiniteness), antitrust, and trade libel.

### 1. *Infringement of Claim 8*

Plaintiff asserts that defendant has literally infringed claim 8 by the making, use and sale of Arlon's ISOCLAD LTE (IL). Literal infringement exists if all the elements of a claim in the patent are shown precisely in the accused device. If a different structure performs "substantially the same function in substantially the same way to obtain the same result," infringement exists under the doctrine of equivalents. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983). At the threshold, the patent claims must be defined, *Moeller v. Ionetics,* 794 F.2d 653, 656 (Fed.Cir.1986), citing *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 866 (Fed.Cir.1985); then the claims are applied to the accused device. *Moeller,* 794 F.2d at 656; *see also SRI Int'l v. Matsushita Electric Corp.,* 775 F.2d 1107, 1118 (Fed.Cir. 1985). Claim interpretation is a question of law. The scope of a claim may be determined as a matter of law when the meaning of the language is not disputed. When the meaning of a term in the claim is disputed, "and extrinsic evidence is necessary to explain that term, then an underlying factual question arises." *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974 (Fed.Cir.1985).

Defendant argues that, as a matter of law, its product does not infringe claim 8 of the patent. Claim 8 reads as follows:

> The material of claim 7 wherein said silica comprises amorphous fused silica powder.

Claim 7 of the patent reads as follows:

> The material of claim 1 wherein said ceramic filler comprises silica.

Claim 1 of the patent describes:

> An electrical substrate material comprising: fluoropolymeric material; ceramic filler material, said filler material being in an amount of at least about 55 weight percent of the total substrate material; said ceramic filler being coated with a silane coating; at least one layer of metal being disposed on at least a portion of said electrical substrate material.

Hence plaintiff's product contains "at least about 55 weight percent" ceramic filler material which, in turn, "comprises silica" which "comprises amorphous fused silica powder."

Defendant's IL has the following composition:

> 1% type 104W Microfibers (Johns–Manville) 64% of a mixture of 80% Amorphous $SiO_2$ (Harbison Walker) and 20% HC11 Aluminum Magnesium Silicate (Industrial Corporation), both powders precoated with 1% Silane and 0.5% polyvinylmethylether.

35% Teflon 60 (DuPont) Substrate adhered to copper layer. Plaintiff's exh. 19.

Defendant argues that IL differs from plaintiff's product because IL contains 51.2% amorphous silica (80% of 64%), and not the patent's 55%. Defendant further argues that IL contains 12.8% aluminum magnesium silicate (20% of 64%), whereas claim 8 does not include aluminum magnesium silicate.

Defendant does not dispute that aluminum magnesium silicate is in fact a ceramic filler. Hence the total ceramic filler in IL is 64%. Plaintiff argues that aluminum magnesium silicate is not an additional component, but rather is a ceramic which with the amorphous fused silica, meets the claim's specification limitation of at least about 55 weight % ceramic filler.

To sustain defendant's argument, the term "comprises" must be interpreted to exclude any constituent except that which is explicitly specified in the patent. In other words, the ceramic filler comprising silica comprising amorphous fused silica powder contains nothing other than amorphous fused silica powder.

Plaintiff argues that the term "comprising" is transitional, rendering the composition open to additional elements not explicitly mentioned in the claims. The term "comprising" embraces other steps, elements, or materials in addition to the elements or components specified in the claims. *Dow Chemical Co. v. American Cyanamid Co.*, 615 F.Supp. 471, 484 (E.D.La.1985), *aff'd*, 816 F.2d 617 (Fed.Cir.), *cert. denied*, 484 U.S. 849, 108 S.Ct. 149, 98 L.Ed.2d 105 (1987). *In re Baxter*, 656 F.2d 679, 686 (C.C.P.A.1981). In contrast, a claim that is limited to the ingredients specified and those that do not materially affect the composition employs the term "consisting essentially of." *Dow*, 615 F.Supp. at 484. As IL contains at least 55 percent ceramic filler material comprising silica, it infringes claim 8.

In *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 n. 8 (Fed.Cir.1986), *cert. denied*, 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987) "comprising" four cubes was found to mean "having" four cubes rather than "having at least" four cubes. Howev- er, that product was a cube puzzle composed of eight smaller cubelets that could be rotated in groups of four adjacent cubes, *id.* at 1263. The more restrictive interpretation was the only reasonable one as well as the only one that would make the steps of the method internally consistent.

Defendant offers no evidence that due to the aluminum magnesium silicate IL does not perform substantially the same function in substantially the same way to obtain the same result as plaintiff's product. However, because the patent has been literally infringed, the doctrine of equivalents does not come into play. *See Hughes Aircraft*, 717 F.2d at 1361.

### 2. *Counterclaim for Declaratory Judgment of Patent Invalidity*

Arlon's first counterclaim is a request for a declaratory judgment that the patent is invalid.

#### a) *Anticipation, improper inventor, and prior invention, 35 U.S.C. § 102*

█ Defendant argues that the patent is anticipated by a prior sale by Keene Corp., now Arlon.

Anticipation requires the presence in a single prior art reference disclosure of each and every element of the claimed invention, arranged as in the claim.

*Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984) (citations omitted). *See also General Electric Co. v. United States*, 572 F.2d 745, 768 (U.S.Ct.Cl.1978).

█ The Keene (Arlon) products alleged to have anticipated the patent product are DICLAD 806 AND DICLAD 810. DICLAD 810 contains 65.2% $TiO_2$ and 34.8% PTFE, wherein the $TiO_2$ weight included 1% Z6020 silane as a coating and 0.5% PVME based upon weight of the $TiO_2$ present. DICLAD 806 contains 46.5% $TiO_2$, 43.5% PTFE, and 10.0% Minusil, wherein the weight of the ceramic fillers included 1% Z6020 silane as a coating and 0.5% PVME. Plaintiff does not dispute that these products were sold by Keene prior to the critical date. However, DICLAD 806 and 810 do not include fused amorphous silica. Hence every element of

the invention claimed in the patent is not present in Arlon's prior products.

Title 35 U.S.C. § 102 invalidates a patent if the inventor "did not himself invent the subject matter sought to be patented." Arlon alleges that John Taylor, an Arlon chemical engineer, is the inventor of the subject matter of the '284 patent. Taylor testified that the inventors could not have taken from him what is claimed in the '284 patent, that he did not try fused amorphous silica until he evaluated Rogers' product, and that he hadn't been successful in making a low CTE laminate with various silica fillers. Taylor deposition at 508–10.

### b) *Obviousness, 35 U.S.C. § 103*

 To render a claimed invention "obvious" and unpatentable the differences between the subject matter claimed and the prior art must be such that the subject matter as a whole would be obvious to an ordinary person skilled in the art. 35 U.S.C. § 103. In determining obviousness, significant factors include the scope and content of the prior art, differences between the prior art and the claims at issue, level of ordinary skill in the pertinent art, and evidence of secondary considerations. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed.Cir.1984).

### i) *The '180 Patent*

 U.S. patent 4,335,180 (the '180 patent), invented by Robert Traut, is assigned to Rogers. The disclosure of the '284 patent stated that the '180 patent:

> discloses an electrical substrate material which has both improved electrical properties and surface mount reliability. This material is described as a microwave circuit board comprised of a glass reinforced fluoropolymer filled with a ceramic. While suitable for its intended purposes, the microwave material of U.S. Pat. No. 4,335,180 suffers from an important deficiency in that the material exhibits a high degree of water absorption (i.e., the material is hydrophilic). As a result, moisture is absorbed into the microwave circuit leading

to undesirable changes in the electrical and other properties of the circuit.

Defendant argues that the water absorption of the '180 patent would have led a person skilled in the art to add a silane coating onto the ceramic filler as claimed in the '284 patent.

Contrary to defendant's contention, Dr. Traut did not identify silane as the only difference between the products. He mentioned silane as one difference and that he "wouldn't feel qualified to comment on any others." Traut deposition at 33. As evidence of the nonobviousness of the '284 patent, Dr. Traut also stated that he would not have selected silica when seeking a substance to provide low loss, low thermal expansion and chemical inertness. *Id.* at 30. Defendant has not produced any evidence to negate plaintiff's evidence that in addition to its hydrophobic qualities, the silane coating provided the electrical substrate material with unexpected improvements to substrate/copper adhesion, strength and dimensional stability. *See* Patent, col. 2, lines 59–63.

### ii) *1952 Article*

An article published in *Electrical Manufacturing* entitled "Metal-surfaced and other Fluorocarbon Combinations" described combinations of fluorocarbon polymers containing particulate fillers and bonded to metallic substrates. It notes that filler materials include ceramics and fiberglass and that metal substrates include copper. *Electrical Manufacturing* article at 107–09. It also states that the relatively high coefficient of thermal expansion (CTE) of Teflon is correctable by filling techniques. *Id.* at 282–83. Defendant argues that one seeking to lower the CTE would naturally look to amorphous fused silica.

This article does not describe electrical substrate material containing silica filler with a silane coating. While there is evidence that silica among ceramics does have a very low CTE, there is no evidence that it would be "natural" to select amorphous, fused silica to lower the CTE. In fact, defendant's chemical engineering expert testified that he "figured nobody would be dumb enough to

put silica in" because of its hardness. Taylor deposition at 177–78.

### iii) *Plueddemann Textbook*

The textbook *Silane Coupling Agents* by Edwin P. Plueddemann, Plenum Press, NY (1982) notes the possibility of silane coupling agents reinforcing any organic polymer, that silane modification produces changes in other properties of the mixture, that hard fillers such as silica respond well to appropriate coupling agents, and that fluorocarbon polymers are relatively nonreactive. Plueddemann at vi, 11, 167, 173, 193, 132–33. The reference to fluorocarbon polymers relates to bonding silane to a fluoropolymer, not bonding silane to a ceramic filler in a fluoropolymer. Nor is Pleuddemann's discussion sufficiently specific to make the invention in the '284 patent obvious.

### iv) *Atherton Patent*

U.S. patent 4,036,807 (the Atherton patent), cited on the cover of the '284 patent, states:

> Fluorocarbon derivatives containing silane or siloxane groups may be used for the treatment of fillers e.g. glass fillers in the manufacture of filled granular grades of fluorocarbon polymers. Preferably the filler is treated with a solution of the derivative in an organic solvent to coat the filler with the derivative and make it hydrophobic prior to agglomerating it with the fluorocarbon polymer from an aqueous medium.

Atherton patent at col. 2, line 53. Atherton discloses a new class of silanes and siloxane used to coat fillers in fluorocarbon polymers. The silane coating renders the material hydrophobic. Arthur deposition at 349. Atherton thus demonstrates that silane was known to render ceramic fillers hydrophobic. However, it does not appear that it was known that a silane coating on amorphous silica in a fluoropolymeric matrix would improve the copper/substrate adhesion, matrix strength and dimensional stability of electrical substrate material.

### v) *Secondary Considerations*

Taylor has testified that at least as early as 1982 he had been trying various silica fillers in an effort to make a low CTE laminate but thought they wouldn't work. *See* Taylor deposition at 509–10. The Rogers product has been commercially successful. *See* plaintiff's exh. 47; *Jones,* 727 F.2d at 1530–31.

### c) *Enablement and Indefiniteness,* 35 U.S.C. § 112

 Arlon alleges the specification and claims are nonenabling and indefinite because they direct a ceramic loading "of at least about 55 weight percent," citing 35 U.S.C. § 112. Enablement is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). A patent is not indefinite "if the claims, read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits." *Id.* (citing *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 624 (Fed. Cir.1985)).

The patent, in describing the preferred embodiment, specifies that the optimum range for the ceramic filler is 62–64% silica (col. 4, lines 65–66). Taylor, a person skilled in the art, stated that he understood the phrase "of at least about 55 weight percent" and could make the laminate described in the '284 patent using only the patent. Taylor deposition at 506–08.

### 3. *Arlon Counterclaim for Sherman Antitrust Violations*

 Arlon alleges plaintiff's attempted monopolization, in violation of § 2 of the Sherman Act, by fraudulently procuring the '284 patent and enforcing it in this litigation. Section 2 of the Sherman Act provides that it is unlawful to:

> monopolize, or attempt to monopolize or combine or conspire with any other person or persons to monopolize any part of the

trade or commerce among the several states, or with foreign nations.

15 U.S.C. § 2.

Liability for attempted monopolization requires proof of three elements: (1) anticompetitive or exclusionary conduct; (2) specific intent to monopolize; and (3) a "dangerous probability" that the attempt will succeed. *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). The third element may be satisfied if the alleged monopolist has a significant market share when it commits the unlawful conduct. It cannot, however, be presumed by proof of the first two elements. *Id.*

Defendant has not produced evidence sufficient to permit a reasonable jury to conclude that the patent was fraudulently obtained, or that plaintiff brought or maintained this lawsuit in bad faith or with an intent to monopolize. Hence there is no basis to find unlawful conduct violative of § 2.

#### 4. Arlon Counterclaim for Trade Libel

■■■ The third counterclaim alleges trade libel based on a conversation wherein a Rogers employee allegedly advised a customer of defendant not to purchase LTE material from Arlon because Rogers was suing Arlon for patent infringement and "there was a cease and desist order being issued on Arlon." Notwithstanding these alleged statements, the customer purchased Arlon's product over Rogers' product. Deposition of Mark Carlson at 16–17. There is no evidence that the sale was delayed as a result, nor of any resulting damages.

To prove trade libel, it must be shown that plaintiff suffered special damages as a result of a false disparaging statement. *See K.W. Dolmar Broadcasting Co., Inc v. Matar*, 1992 WL 188915, 1992 Conn.Super. LEXIS 2347 (1992). Defendant has not produced any evidence of damages. Summary judgment is granted in favor of plaintiff on the counterclaims.

#### D. Arlon's Motion Under Rule 56 that Claims 1–5, 7–8, 10, 27, 29 and 30 are Invalid

Defendant moves for summary judgment that claims 1–5, 7–8, 10, 27, 29 and 30 of the patent are invalid. In support of this motion, defendant relies on the formulations of DI-CLAD 806 and 810, and on its arguments in opposition to plaintiff's motion for summary judgment on the invalidity counterclaim.

For the reasons discussed in section II.C.2 *supra*, the motion is denied.

#### E. Cross Motions for Summary Judgment in 2:92CV00995

■■■ Both parties move for summary judgment as to all issues presented in this second action, the facts of which are outlined in section I, *supra*. Document PDX–121, the call report by Tschida that forms the basis of this action, states:

> Patti called to see how things were going. She was worried about reduction in force at Chandler. Through June (early) they only booked about $3.5mm dollars in 5880 & 5870. They are off. 6002 added almost $1mm in bookings but they're roughly 50% of where they were in 1990. They are also not replacing people who leave now. She claimed virtually no military releases which was about 70% of their random weave products.

Tschida subsequently sent a copy of this call report to two other individuals at Arlon, who normally send copies of call reports to approximately 10 additional people at Arlon. Tschida testified at his deposition that Patti works or had worked for Rogers. Tschida deposition at 21.

Rogers bases this action upon its claim that Arlon "disclosed" Rogers trade secrets by disseminating throughout Arlon the information supplied by Patti to Tschida. One who discloses another's trade secret without a privilege to do so is liable if he learned the secret from a third party with notice that the information was secret and that the third party's disclosure was a breach of duty to the person seeking relief. *Restatement of Torts* § 757(c) (1939).

Plaintiff's claim against Arlon for misappropriation is essentially based upon alleged disclosure by Arlon to itself. Plaintiff cites no precedent supporting the proposition that a corporation may be held liable on this basis. Rogers has produced no evidence that Arlon disclosed the information to any third party or used the information in any other way.

### III. *CONCLUSION*

Accordingly, in Civil No. 2:91CV01166, Arlon's motion for summary judgment of invalidity and unenforceability (doc. # 75) is denied. Rogers' motion for partial summary judgment as to infringement of claim 8 and as to counterclaims (doc. # 69) is granted. Arlon's motion for summary judgment of invalidity (doc. # 86) is denied. Defendant's motions for separate trials (doc. # 110) and for reconsideration (doc. # 111) are denied without prejudice to renewal in light of this court's findings *supra*.

In Civil No. 2:92CV00995, defendant's motion for summary judgment (doc. # 33–1) is granted, but the request for fees (doc. # 33–2) is denied. Plaintiff's motion for summary judgment (doc. # 50) is denied. Defendant's petition for fees re motion to compel (doc. # 31–2) is granted in accordance with the endorsement ruling dated 8/3/93 on that document.

SO ORDERED.